## CITY ICE CO. v. YORK MFG. CO.

(Circuit Court of Appeals, Fifth Circuit. June 16, 1919. Rehearing Denied October 7, 1919.)

### No. 3295.

PRINCIPAL AND AGENT ☞101(1)—AUTHORITY OF AGENT TO SIGN CONTRACT—CONSTRUCTION OF CORRESPONDENCE.

Undisputed evidence, consisting of correspondence between defendant, a manufacturing company, and its agent, who had general authority to solicit contracts subject to approval by defendant, *held* to authorize him to bind defendant by the contract sued on, and to entitle plaintiff to an instructed verdict for the admitted refusal of defendant to perform such contract.

Foster, District Judge, dissenting.

In Error to the District Court of the United States for the Southern Division of the Northern District of Alabama; William I. Grubb, Judge.

Action by the City Ice Company against the York Manufacturing Company. Judgment for defendant, and plaintiff brings error. Reversed.

This was an action by the plaintiff in error, City Ice Company, against the defendant in error, York Manufacturing Company, to recover damages for the alleged breach of a written contract to sell and deliver certain ice manufacturing machinery. The parties will be referred to as the Ice Company and the York Company, respectively. The case was tried on issues joined on pleas of non est factum and the general issue, with leave to present thereunder any special defense.

The following state of facts was shown by undisputed evidence: During the period covered by the dealings between the parties the Ice Company was a manufacturer of ice, doing business at Mobile, Ala., and the York Company was a manufacturer of ice-making machinery, having its factory and main office at York, Pa. Several months prior to the signing, as hereinafter stated, by an agent of the York Company, of the alleged contract, the Ice Company made it known to several manufacturers of ice-making machinery, including the York Company, that it contemplated the purchase of an ice manufacturing plant, consisting of two refrigerating machines, each having a capacity of 50 tons of ice per 24 hours, and additional capacity to maintain a temperature of 28 degrees Fahrenheit in storage room having 100,000 cubic feet capacity. A representative of the Ice Company visited York, and had interviews with representatives of the York Company, in which the former's desire to buy a 100-ton plant was mentioned. Following this, the York Company, on October 23, 1914, made and transmitted to E. R. Feagin, to be submitted by the latter to the Ice Company, two alternative estimates, consisting of lists of machinery and equipment, stating price for the same, but not mentioning capacity. Feagin was a traveling salesman of the Southern Construction & Supply Company of Atlanta, which was the York Company's agent for territory including Mobile, the terms of the agency being expressed in a written contract between the principal and agent, a provision of that contract being that among the duties to be performed by the agent are "to solicit orders for the machinery and apparatus which is manufactured, sold, or handled by the principal, and to submit the same to the principal for acceptance." On November 5th the York Company sent to Feagin three additional estimates, consisting of lists of machinery and prices for same, no mention being made of capacity. In a communication of the York Company to Feagin dated November 12th, inclosing a blueprint referred to as showing the 100-ton plant, it was said: "You will understand that these layouts are only preliminary, and, of course, are subject to change in case the proposition goes through." For about two weeks prior to November 27, 1914, Feagin was in Mobile, negotiating with representatives of the Ice Company for the sale of an ice plant to the latter. During most of that time the Ice Company was negotiating with other manufacturers of ice-making machinery, and the agents of the several manufacturers were actively competing for the business. While such negotiations were in progress the following correspondence took place:

"Day Letter.

"Mobile, Ala., Nov. 16th, 1914.

"York Mfg. Co., York, Pa.

"Mail special delivery today care Battle House detail prices your several estimates City Delivery Co., dated October twenty third propositions A and B also November fifth alternates Number one and two. Must have this information in order to make omissions as may be required give power requirements for auxiliaries in each case also best shipment and completion. Rush.

"E. R. Feagin."

"Western Union Telegram.

"Mobile, Ala., Nov. 16th, 1914.

"York Mfg. Co., York, Pa.

"Our price is about 10 per cent. higher. Will be offered contract below your price. Are you willing to accept. Advise by mail. See Day Letter.

"E. R. Feagin."

(259 F.)

"Battle House.

"Mobile, 11–16–14.

"York Mfg. Co., York, Pa.

"Gentlemen:

"Attention Mr. Strickler.

"I wired you today regarding the City Delivery Co. proposition.

"Had a long talk with Mr. Holcombe this morning and he says that everything being equal we will get the contract, however, the present prices are entirely out of the question. Hence my wire. I feel sure that we will have a little preference shown us, but not as much as the present propositions call for.

"I think the oil engines will be used, and it looks as if Nordberg has the advantage over Snow. It will also probably be a belt drive.

"Contract for engines will be let Wednesday, I think, and ice machinery on Thursday or Friday next, as mentioned in my wire, and think they will make me an offer on the job, if the price is out of line, before closing. And if it is anywhere near reasonable, I will sign it and send it in for your approval or disapproval.

"We must get it if there is a possible chance.

"Mr. Holcombe also advises that our regular terms, viz.: ¼ cash on shipment, ¼ on completion, balance in 6, 12 and 18 months, would very likely be satisfactory.

"I hope to send in the contract before leaving here.

"Yours truly,      E. R. Feagin."

"November 16, 1914.

"Mr. E. R. Feagin, Care Battle House, Mobile, Ala.

"Dear Sir: We are in receipt of your Day Letter, also Telegram relative to the proposition for Mobile, Ala. We note in your telegram that our price is about 10 per cent. high, and that in all probability they will make you an offer on this proposition. We also note in your Day Letter that you want detailed estimates, also power required for the auxiliaries.

"This proposition is a large one and we feel that we should have all the information right here at the factory before we make any revised prices to these people.

"Immediately upon receipt of this letter, kindly wire us what proposition appears favorable to these people, and what omissions or additions they intend to make to the same. We will then be in a position to give you our best figure, also the horse power required for the different various auxiliaries.

"You will understand that a proposition of this nature should be gone into very carefully and you should not make any hasty guarantees or prices, and for this reason we feel that you should supply us with all the information, as fast as you receive it from these people, and keep us posted continually so that we can revise our quotations and give you the information in such a manner that we will at least be in the running, and if possible, secure the order.      Yours truly,      York Manufacturing Co."

"Western Union Night Letter.

"Mobile, Ala., Nov. 18—14.

"York Mfg. Co., York, Pa.

"Your letter sixteenth. At present bids are being received on original specifications using oil engines belted compressors drop pipe freezing system as per your estimate dated Nov. fifth marked alternate Number one with following changes: Use horizontal machines twenty standard condensers erecting engineer only omit electric generator and board insulation of tanks. This bid is for comparison with others my alternate proposition to them is (1915) system your alternate numbers two November fifth with above omissions and following changes use vertical high speed direct connected compressors hundred sixty revolutions they furnish oil engines on this also give price belted compressor contract probably be let Friday. Wire me detail follow with letters if you had given information as I asked in my wire I could have handled job as it is you have probably lost it by the delay. I am afraid I can't hold them off until mail reaches here. If I don't hear from you will do best I can to get it. Advise as soon as possible.      E. R. Feagin."

"Telegram.

"York, Pa., November 19, 1914.

"Mr. E. R. Feagin, Care Battle House, Mobile, Ala.

"Our estimates Mobile proposition dated October twenty-third. Proposition A deduct for gas engines, generator, switchboard and engine for same Thirty-six Thousand Dollars. If erecting engineer only furnished Three Thousand Dollars. Proposition B deduct for Snow oil engines, generator and engine for driving same Thirty-two Thousand Dollars; erecting engineer only Three Thousand Dollars. Original price did not include tank insulation.

"York Manufacturing Company."

"November 19, 1914.

"Mr. E. R. Feagin, Care Battle House, Mobile Ala.

"Re: City Ice Delivery Co.

"Dear Sir: We are in receipt of your day letter relative to the above proposition. We have just wired you as per the enclosed confirmation.

"We note in all your correspondence you refer to our estimate of November 5th. We are unable to locate this estimate, as our proposition is dated October 23rd.

"Proposition 'A' covers the '1915' style raw water freezing system, with 16-inch x 24-inch belt driven compressors, and Rathbun-Jones Gas Engines, with Smith Producers. We instructed you that if the gas engines for driving the machines were omitted, also the generator and switchboard, as well as the gas engine for driving the generator, and if we furnished an erecting engineer only, in place of complete erection, you could deduct a total of $39,000.00.

"Proposition 'B' is for same outfit, using, however, high speed vertical compressors, direct connected to oil engines, and on this proposition if the engines were omitted, also the generator and switchboard, and engine for driving the generator as well as complete erection, you could make a reduction of $35,-000.00.

"Our original proposition did not include any insulation for the freezing tank.

"We are enclosing photographs of a 50-pound block of ice which we made from the water sent us. The water above the squaring plates as the block was frozen was almost the color of coffee, but you will note, however, that the block is very clear. We packed this block in a barrel, surrounded with granulated cork, and are shipping the same to the City Ice Delivery Company to-day, by express. Of course, we cannot guarantee that the same will arrive in good condition.

"Of course, if they make you an offer on this proposition you had better sign up, and we can then take the specifications, go over the same very carefully, and can either accept or reject the proposition according to the price secured.

"Yours truly,                          York Manufacturing Co."

"Battle House, Mobile.

"11-20-14.

"York Mfg. Co., York, Pa.

"Gentlemen:

"Attention Mr. Strickler.

"Enclosed find copy my estimate for the City Delivery Co.

"The price of $37,095.00 is about $3,150.00 too high, as compared with Frick. Triumph is still lower, but his price and proposition I don't think will be seriously considered.

"Are you willing to meet Frick on this job?

"You will note that my estimate I have taken off the extra 5 per cent. in nearly all figures, but still can't get down. I hope to hold it open till Monday although it is very likely the contract will be let Saturday. I understand that Frick has instructions to get the contract, and they are figuring accordingly.

"The job is too good for us to pass up if possible to get it.

"If they decide on my proposition as per estimate I think they will no doubt change to the '1915' raw water system, at the higher price, viz., about $3,300.00 more than my estimate, and also put 32,000 ft. of coils in tank at an extra price.

"Kindly check over the estimate and see if you will be willing to make a better price.

"Will wire you night letter Sunday night, if proposition is still open.

"Yours truly, E. R. Feagin, Battle House, Mobile, Ala."

[Enclosed with the letter last above copied was a list of materials and machinery, with the prices therefor. (Record, pp. 188–9).]

"11–21.

"York Mfg. Co.

"Gentlemen:

"Attention Mr. Strickler.

"Reference City Del. Co. job.

"Wish to advise I have had another session with them today since writing you last night enclosing my estimate, as a result I find out that De La Vergne is high. Our price $38,000.00 is next; the next price is $33,950.00 (either Frick or Artic), and Triumph $31,000.00 and each one has asked for a chance to cut it. Necessary to secure the order. Where in H— do we get off?

"Mr. Holcombe promised me the refusal of the job before finally closing, and he personally would give me the order at my present price but our Austrian friend says we must meet the lower price. So you see what I am up against.

"Yours truly, E. R. Feagin."

"'Western Union Night Letter.

"Mobile, Ala., Nov. 22nd, 1914.

"York Mfg. Co., York, Pa.

"Referring to my estimate mailed twentieth will you be willing to make ten per cent. cut. Will take at least this much to get contract. If possible to do so wire me quick. Also see my letter twenty-first. Must have this business. Answer care Battle House. E. R. Feagin."

"W. U. Telegram.

"York, Pa., November 23, 1914.

"Mr. E. R. Feagin, Care Battle House, Mobile, Ala.

"Can close City Ice Delivery proposition per your estimate at Thirty-four Thousand Dollars, subject to our approval.

"York Manufacturing Company."

"Western Union Night Letter.

"Mobile, Ala., Nov. 23, 1914.

"York Mfg. Co., York, Pa.

"Have refusal, Thirty-Thousand even as per my estimate mailed you. Above is Vilter proposition. Have compared specifications personal. They furnish Twenty-two Thousand feet extra heavy coils, Sixteen Thirty Two compressors balance same as ours using either drop pipe or hexamer patent pump as selected. Vilter making this offer personally. Shall I sign. Must know by noon Tuesday. Answer quick. E. R. Feagin."

"Western Union Day Letter.

"Nov. 24, 1914.

"Mr. E. R. Feagin, Care Battle House, Mobile, Ala.

"Get contract best figure possible, take thirty thousand if can do no better. Vilter is undoubtedly figuring on steel pipe, light covers and gang air connections to cans. Do not specify any more details than necessary so we can furnish same class material as Vilter. Get copy their specifications if possible. York Manufacturing Co."

"Western Union Night Telegram.

"Mobile, Ala., Nov. 23rd, 1914.

"York Mfg. Co., York, Pa.

"Will you consider splitting contract with Vilter, each taking complete fifty ton. Answer. E. R. Feagin."

"Western Union Telegram.

"Nov. 24, 1914.

"Mr. E. R. Feagin, Care Battle House, Mobile, Ala.

"Do not care to split contract with Vilter unless we can get good price for plant. York Manufacturing Co."

"Western Union Telegram.

"Mobile, Ala., Nov. 24–14.

"York Mfg. Co., York, Pa.

"Must have authority to close contract without delay fully guaranteeing acceptance. Financial conditions considered good. Competitors have given this. Answer quick. E. R. Feagin."

"Western Union Day Letter.

"Nov. 25, 1914.

"Mr. E. R. Feagin, Care Battle House, Mobile, Ala.

"Have wired City Ice Delivery Company guaranteeing to accept contract signed by you provided satisfactory financial report accompanies same. As this gives you full authority be careful not to tie us up on special apparatus or guarantees. York Manufacturing Co."

"Western Union Day Letter.

"Nov. 25, 1914.

"City Ice Delivery Company, Mobile, Ala.

"We hereby authorize Mr. Feagin to sign contract with you and will guarantee to accept contract so far as price is concerned, but satisfactory financial reports must accompany contract as we have no statement of your financial condition, nor are you rated in Bradstreets. York Manufacturing Co."

"Western Union Night Letter.

"Mobile, Ala., Nov. 26, 1914.

"York Mfg. Co., York, Pa.

"Before I can get signatures to contract they insist on absolute guarantee of acceptance financially and otherwise. Have gotten following reports. City Ice Co. organized and charted December last. Reorganized this Fall. Have Twenty-Five Thousand paid in capital. Tripo Chiepalich President and principal owner, M. Chiepalich Vice-President, R. L. Holcombe, Secretary and Treasurer. Banks advise Tripo Chiepalich worth about Seventy-Five Thousand and all concerned considered good moral risks. Am getting further reports from Bradstreet and Banks. Wire full authority to sign at once. Must leave here noon Friday. Wire me personally quick. E. R. Feagin."

"Western Union Telegram.

"Nov. 27, 1914.

"Mr. E. R. Feagin, Care Battle House, Mobile, Ala.

"We hereby give you full authority to sign City Ice Company contract provided they give bonds in security for deferred payments, or officers personally guarantee payments, bonds in ten per cent. in excess of amount of deferred payments to be given. York Manufacturing Co."

"Western Union Telegram.

"Mobile, Ala., Nov. 27–14.

"York Mfg. Co., York, Pa.

"Party will not sign except on straight proposition no bonds or personal guarantees. Terms payment to be fourth cash, fourth completion, balance six and eighteen months. Answer quick. E. R. Feagin."

(259 F.)

"Western Union Telegram.

"Nov. 27, 1914.

"E. R. Feagin, Battle House, Mobile, Ala.

"You are authorized to sign City Ice Company contract in our name.

"York Manufacturing Co."

Where the name City Delivery Company appears in the above correspondence it means the Ice Company. The latter conducted a department of its business under the first-stated name. On November 27th a written contract for the sale by the York Company to the Ice Company of two ice-making units was signed in the name of the former by Feagin, and in the name of the latter by its president and secretary and treasurer. That instrument contained the following provisions: "The York Manufacturing Company hereby guarantees that each machine consisting of the herein described engine and gas pump, under test will give a duty equal to the manufacture of 55 tons of ice in twenty-four hours, when operating under 15.67 pounds back pressure and 185 pounds condensing pressure, and at 68 R. P. M. [meaning revolutions per minute]. * * * The York Manufacturing Company guarantees that the above freezing system (can system Nos. 1 and 2) under test will have an ice-making capacity of 110 tons of ice per day of 24 hours each, each ton to consist of five blocks, with the water entering the case at 40 degrees or less, when properly and continuously operated, and said ice to be suitable and merchantable for all domestic purposes. * * * 1292 galvanized freezing cans, size 14½"x14½"x necessary length. Cans will weigh about 100 pounds each, and have a capacity to make a block of ice to weigh about 440 pounds in cans."

Following provisions for the York Company furnishing a specified number of feet of piping, to be so connected with the refrigerating system that when such system is operated as specified it would maintain a stated temperature in an ice-storage room having a capacity of 100,000 cubic feet, and for that company furnishing a machine for holding such temperature in that room 'when large machines are not running,' the contract contained the following provision:

"The York Manufacturing Company guarantees the following performance: That the said piping, under test, when operated in full and continuous operation, will cool the rooms, apartments, cellars, or spaces as specified in the preceding table, and aggregating in the sum total 100,000 cubic feet of space provided that the rooms, apartments, cellars, or spaces are properly insulated and used with proper care, that the work be properly distributed throughout, and that the total work to be done in same does not exceed 12 tons of ice melting capacity per twenty-four hours of continuous operation. * * * The party of the second part (the Ice Company) has the option for fifteen days from this date within which to change this agreement in such manner as to substitute for the machinery and equipment herein contracted for like machinery of sufficient capacity to produce 55 tons of ice per day of 24 hours, and to that end only such of the machinery described in the attached specifications as is necessary to complete one unit instead of two units as there provided for shall be furnished and installed, except, however, that if such change be made the following stipulations are agreed to."

The "following stipulations" provided for stated changes in equipment, and for the amount to be paid by the Ice Company being one-half of what that amount was to be if the change should not be made, with $50 added to such one-half. When the York Company was apprised of the contents of the instrument signed in its name by Feagin it refused to comply with it and gave notice of such refusal to the Ice Company. The following are extracts from the testimony of George Braungart, a witness for the York Company: "This contract calls for a 16½ by 24 vertical single acting compressor, running at 68 revolutions, with 15.67 pounds back pressure and 185 pounds head pressure. Under those conditions the machine would have an actual ice-making capacity of 49 tons." "There is nothing, as a practical proposition, to prevent them from running the machine faster than 68 revolutions a minute, and if they would run it faster it would produce more ice." Testimony of other witnesses for the York Company was to the effect that the capacity of each of the two

ice-making units mentioned in the contract, when the ammonia air compressor is operated at 68 revolutions per minute, and under other conditions stated, had a capacity of 49 tons of ice a day; that by increasing the number of revolutions per minute more ice would be made, and less would be made if the number of revolutions is decreased; and that each unit would make 55 tons of ice per day with the required increase of the number of revolutions of the compressor, such increase being practicable, but requiring the use of more power. The court refused to give the following charge requested by the plaintiff, the Ice Company: "The court charges the jury that if you believe the evidence in this case your verdict must be in favor of the plaintiff."

At the request of the defendant, the York Company, it gave the following charge: "The court charges the jury that if they believe from all the evidence in this case that E. R. Feagin had no authority to bind the defendant under contract, their verdict must be for the defendant." Exceptions were reserved to the above-mentioned and other rulings, the effect of which was to leave it to the jury to determine whether Feagin was authorized to bind the defendant by the contract the alleged breach of which was complained of.

T. M. Stevens, of Mobile, Ala. (Tillman, Bradley & Morrow, of Birmingham, Ala., and Stevens, McCorvey & McLeod, of Mobile, Ala., on the brief), for plaintiff in error.

H. C. Niles, of Kosciusko, Miss.; and A. G. & E. D. Smith, of Birmingham, Ala., for defendant in error.

Before WALKER and BATTS, Circuit Judges, and FOSTER, District Judge.

WALKER, Circuit Judge (after stating the facts as above). In behalf of the York Company it was contended that its telegram of November 27th to Feagin, "You are authorized to sign City Ice Company contract in our name," had reference to such a 100-ton ice plant as had been the subject of previous negotiations, and did not confer on him authority to bind the York Company by such a contract as the instrument signed evidences. The rulings complained of resulted from the conclusion reached by the court that under the evidence adduced it was open to the jury to find that the words "sign City Ice Company contract" had reference only to a contract for a 100-ton plant, with means of keeping at freezing temperature 100,000 cubic feet of storage space, as contemplated in preceding negotiations, and that the telegram did not authorize Feagin to bind the York Company to a contract which gave the Ice Company the option to take either a 110-ton plant or a 55-ton plant. The nature and scope of Feagin's agency, as it existed before the just-mentioned telegram was sent, were disclosed by undisputed evidence. It was shown by uncontroverted testimony that Feagin was the duly authorized representative of the Southern Construction & Supply Company, upon which the York Company, by written instrument, had conferred authority "to solicit orders for the machinery and apparatus which is manufactured, sold, or handled by the principal, and to submit the same to the principal for acceptance." Before the sending of the telegram of November 27th, Feagin, as the representative of his immediate principal, was authorized to solicit and submit to the York Company for its acceptance such an order for machinery as the contract sued on embodies, whether such an order had or had not been the subject of previous negotiations. It seems that such a telegram as that of No-

vember 27th, sent to one already having the authority just mentioned, had the effect of so enlarging that authority as to make it one to solicit and accept in behalf of the York Company such an order as the instrument signed embodied, whereas before the authority possessed by the addressee of the telegram did not extend beyond soliciting such an order and submitting it to the York Company for acceptance, and that the evidence was such as not to leave it open to find otherwise. The fact that the agent kept in touch with and consulted the principal while the negotiations were in progress does not indicate that prior to the sending of the telegram of November 27th the former did not, as to his dealings with the Ice Company, have the authority conferred by the agency contract. It was against the interest of both agent and principal for the former's efforts to result in obtaining an order which the latter would not accept.

But it may be assumed, without being admitted, that when Feagin went to Mobile he was clothed only with authority to negotiate for the sale of such machinery as the Ice Company had indicated a desire to buy—a 100-ton ice plant and incident means of maintaining 100,000 cubic feet of storage room at or below a freezing temperature. It is contended that that authority was exceeded when the agent undertook to bind the principal to furnish a 110-ton ice-making plant. The uncontradicted testimony showed that the ice-making plant called for by the contract, when operated as and under the conditions therein specified, makes, not 110 tons, but 98 tons, of ice per day. That testimony further showed that that plant would make more or less than 98 tons of ice a day according as the ammonia air compressor is run at a speed of more or less than 68 revolutions per minute, the other stated conditions being the same, and that it is entirely practicable to increase or diminish within a considerable range the number of revolutions per minute above or below the number mentioned in the contract, the product per day being substantially three-fourths of a ton more or less than 49 tons for each revolution in addition to or less than 68, the other stated conditions being the same. It seems that it cannot with any propriety be said that a machine does not answer a call for a 100-ton one when it is equally capable of being so operated as to produce that amount, or more or less than that amount, per day, according as part of it is speeded up or slowed down within entirely practicable limits; and that an agent's sale of such a machine, which, when operated at a speed and under conditions specified in the contract of sale, makes slightly less than 100 tons of ice per day, cannot properly be said to be beyond the scope of an agency to sell a 100-ton machine because the contract contains a warranty that the machine when so operated will make 110 tons of ice a day, or substantially more than in fact it will make when so operated. Such a sale is not of a thing other than the one the agent was authorized to sell, whether the warranty does or does not subject the seller to liability for a breach of it.

Based on the provisions as to capacity to maintain a freezing temperature in storage room having 100,000 feet capacity, and as to the cans to be furnished having a capacity to make blocks of ice weigh-

ing 440 pounds, contained in the instrument signed by Feagin, it was contended in behalf of the York Company that the ice-making machinery called for was guaranteed to have a capacity of even more than 110 tons per day, and that Feagin exceeded the authority conferred on him in undertaking to bind the York Company by such provisions. If the provision as to the capacity of what was called for to maintain a freezing temperature in the storage space mentioned had the effect of guaranteeing additional ice-making capacity, yet such a provision must have been in the contemplation of the York Company from the beginning, as the Ice Company's written request for bids called for bids on "two refrigerating machines, each of which will have a capacity of 50 tons of ice per 24 hours, and additional capacity to maintain a temperature of 28 degrees F. in storage room having 100,000 C. F. capacity." From the fact that the cans to be furnished were to have a capacity to make blocks of ice weighing about 440 pounds it does not follow that the above-quoted guaranty of the ice-making capacity of the freezing system can be given a meaning different from the one expressed by its language. The language of the provisions, taken together, cannot be given the effect of guaranteeing an ice-making capacity of more than 110 tons of ice per day of 24 hours. The guaranty clause in question says each ton "to contain five blocks." It does not say that each block shall be more than a fifth of a ton. The average weight of five units together making a ton is one-fifth of a ton. A fifth of a ton or less of ice may be made in a can having a capacity to make more than that amount. Ice-making capacity of more than 110 tons is not called for by a guaranty of a capacity of only 110 tons.

Even if the authority originally conferred on Feagin was limited to negotiating for the sale of a 100-ton ice-making plant, the correspondence between him and the York Company, after the former reached Mobile, unequivocally shows that the latter, while the negotiations were in progress, recognized that Feagin was empowered to make changes, omissions or additions required by the Ice Company, to give guaranties, and to stipulate for special apparatus not included in any specifications or bid previously submitted. That the "full authority" explicitly mentioned in the York Company's telegram of November 25th was not intended to be limited to negotiations for an order for a 100-ton plant is shown by its telegram of the day before in reply to the one of Feagin inquiring, "Will you consider splitting contract with Vilter, each taking complete fifty ton?" The York Company's statement, made in its reply, "Do not care to split contract with Vilter unless we can get good price for plant," is inconsistent with the existence of an intention on its part to limit Feagin's authority to negotiating for an order for a 100-ton plant, and shows that it contemplated the possibility of the negotiation resulting in Feagin getting an order for an ice-making machine having a capacity of substantially less than 100 tons a day. In view of that correspondence and the attending circumstances, the York Company's telegram of November 27th, "You are authorized to sign City Ice Company contract in our name," must be regarded as empowering Feagin

to bind the York Company by a contract for whatever he previously had been authorized to obtain an order for.

The conclusion is that the uncontradicted evidence—written instruments and correspondence to which the York Company was a party and undisputed oral testimony—shows that Feagin was authorized to bind the York Company by the contract sued on. The existence of such contract and a breach of it being so shown, the Ice Company was entitled to have the jury instructed to find a verdict in its favor. The court erred in refusing the plaintiff's request for an instruction to that effect. Because of that error, the judgment is reversed.

FOSTER, District Judge (dissenting). The rule is well settled that when a contract contains technical terms parol is admissible to explain such. Evidence was admitted without objections on this question, was all one way, and conclusively showed that in the opinion of the experts the contract was not for a 100-ton plant. The court charged the jury the contract was not for a 100-ton plant. With that I agree. If there was nothing else, the option to take only one-half of the plant destroyed the contract as one for a 100-ton plant. Further, I am unable to follow the majority opinion in distinguishing the guaranty that the plant would produce 110 tons of ice every 24 hours from the balance of the contract.

On the question of Feagin's authority to make the contract, it was clearly shown that he departed from the specifications sent him, and contracted for certain items of machinery and apparatus never contemplated by the previous negotiations, and not regularly manufactured by defendant. The defendant had no knowledge of the changes until it received the signed contract. It was further shown that Feagin received a check for $250, which was not mentioned in the contract. The evidence as to the purpose for which this check was given is conflicting, but the jury may have concluded it was intended for a bribe to induce Feagin to make the unauthorized changes in the specifications. Negotiations between the parties extended over a period of four months, and there were personal interviews between the principals as well as between the plaintiffs' agents and Feagin, in addition to the extensive correspondence. Feagin's authority could not well be predicated upon one or two letters or telegrams, or in fact on less than all the evidence. The impression made upon my mind by the evidence is that Feagin was overreached by the plaintiffs' agents in the final making of the contract, and was induced to sign a document specifying a plant such as was never contemplated by the previous negotiations.

Conceding that the evidence was not disputed, the minds of reasonable men might well have differed as to the conclusions to be drawn from it, and, such being the case, the question of Feagin's authority to make the contract sued on was clearly for the jury. Therefore the action of the District Court in submitting that question to them was right.

Entertaining these views, I am obliged to respectfully dissent.